

**SO ORDERED.**

**SIGNED this 13 day of May, 2009.**

_____
**JAMES D. WALKER, JR.**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | CASE NO. 06-40631 |
| LARRY C. MITCHELL, | ) | |
| | ) | |
| DEBTOR. | ) | |
| | ) | |
| LARRY C. MITCHELL, | ) | ADVERSARY PROCEEDING |
| | ) | NO. 08-4006 |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| UNITED STATES / INTERNAL | ) | |
| REVENUE SERVICE, | ) | |
| | ) | |
| DEFENDANT. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

<u>COUNSEL</u>

For Plaintiff:          Stephen G. Gunby
Post Office Box 1846
Columbus, Georgia 31902

For Defendant:        Benjamin L. Tompkins
Post Office Box 14198
Washington, D.C. 20044

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff's complaint to determine the

dischargeability of certain tax liabilities.  This is a core matter within the meaning of 28 U.S.C. §

157(b)(2)(I).  After considering the pleadings, the evidence, and the applicable authorities, the

Court enters the following findings of fact and conclusions of law in conformance with Federal

Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Procedural History

Debtor Larry Mitchell filed a Chapter 11 petition on August 29, 2006, which was

converted to Chapter 7 on October 3, 2007.  On the petition date, Debtor owed considerable back

taxes to the Internal Revenue Service, including $477,513.44 in personal income taxes,

employment taxes, interest, and penalties for 1998 to 2002.  Of that amount, approximately

$286,000 is at issue in this case–representing about $200,000 in actual income taxes and about

$86,000 in interest and penalties.

On March 19, 2008, Debtor filed an amended complaint to determine the dischargeability

of his past due income taxes pursuant to § 523(a)(1)(B).  In its answer, the United States

contended the past due income taxes were nondischargeable under § 523(a)(1)(C).  The Court

held a trial in this case on February 11-12, 2009, and March 31, 2009, during which the parties

presented evidence and legal arguments.

3

<u>Background</u>

Since 1986, Debtor, who is 57 years old, has been a real estate agent associated with

Coldwell Banker, Kennon, Parker, Duncan and Key Realtors ("Kennon Parker") as an

independent contractor.  In addition, for the past ten years, Debtor has worked with a team of

other real estate agents, assistants, and secretaries marketed under the name "The Larry Mitchell

Team."  During the course of his career, Debtor has been successful as a real estate agent, usually

earning gross commissions of more than $150,000 annually.

Because he is an independent contractor, Kennon Parker does not withhold payroll taxes

from Debtor's commission checks.  Debtor testified he understood he was responsible for

submitting his own income taxes to the IRS.  Until April 1, 2007, Debtor operated as a sole

proprietor and paid the salaries of the non-real estate agent employees, overhead, and expenses

associated with the Larry Mitchell Team.

Until 1998, Debtor filed timely tax returns.  Although he occasionally fell behind in his

payments–resulting in levy threats and repayment plans–he did pay all income taxes he owed

prior to 1998.  The only money the United States collected from the taxes at issue in this case

was approximately $7,000 from three sources: an offset of Debtor's 2004 tax refund, a levy on

his commissions, and payments he made under an installment agreement.

<u>1997 to 2002: Events surrounding the tax delinquency</u>

From 1998 to 2002, Debtor failed to file tax returns or to make estimated tax payments.

However he did timely request and obtain extensions to file his 1998 and 1999 returns.  He

testified he did not pay his taxes because his living expenses, business expenses, and divorce

4

expenses fully exhausted his income.

In 1997, Debtor's marriage to Melanie Mitchell, with whom he had two daughters, began to fail.  After a period of separation, Melanie initiated divorce proceedings in 1998.  Pursuant to temporary orders issued in the divorce suit, Debtor maintained a separate household for himself, provided $3,000 per month in support payments for Melanie and the children, and paid the mortgage on the house in which they lived.  In addition, Debtor was paying all the expenses on 17 investment properties he owned but was barred from selling by the divorce court.

About the time of the divorce, Debtor began suffering from multiple health problems–including depression, heart problems, colon problems, and hyperventilation–some of which required hospitalization.  Debtor testified the expenses and stress of the divorce and the debilitating effects of the medical problems interfered with his ability to work full time and contributed to his increasing financial distress.

 Debtor filed a Chapter 13 petition in January 1999 to stop foreclosure on the 17 investment properties.  No plan was confirmed and the case was dismissed.

In November 1999, the superior court entered a final decree in Debtor's divorce proceeding, requiring Debtor to pay monthly alimony of $2,764.20 and monthly child support of $937.50.  The order also required him to provide copies of his tax returns to Melanie and to pay her six percent of his annual adjusted gross income over $75,000, which was to be calculated without making any deduction for support payments.  In addition, the order required Debtor to pay Melanie a lump sum of $10,000, to pay her attorney fees of $22,134.50, and to give her seven of the eight investment/retirement accounts he owned.

One month later, in December 1999, Debtor married his current wife, Kathleen Mitchell,

who had two children.  At the time of the marriage, one of Debtor's children and both of

Kathleen's children lived with them in a house they rented for $1,200 per month.  In 2000,

Debtor and Kathleen had a child together, so that four children were living in the household.  For

approximately the first five years of their marriage, Kathleen earned no money from work outside

the home and relied on Debtor for financial support, although she did receive about $300 per

month in child support from an ex-husband.

In 2000 and 2001, Debtor sold most of the 17 investment properties.  Debtor realized no

financial benefit from the sales.

In June 2002, Kathleen purchased a house on Pintail Drive for the family.  Debtor

testified it was titled solely in Kathleen's name because Debtor had poor credit and because

Debtor did not want to jeopardize the house with his tax problems.  Kathleen obtained 100

percent financing for the $200,000 purchase price from the owner, who knew Kathleen was not

working at the time and knew Debtor would be making the payments.  Debtor paid the monthly

mortgage of approximately $1,537 from his commissions, as well as the insurance and utility

bills.

Also in 2002, Melanie Mitchell filed a contempt motion demanding copies of Debtor's

tax returns to determine the six percent of his income over $75,000 she was entitled to under the

divorce decree.  She requested payments for all three years since the divorce (1999, 2000, and

2001) at one time, which amounted to approximately $4,000 to $5,000 for each year, for a total

of about $15,000.  Debtor testified he had previously fallen behind in his support payments

several times and, consequently, had been threatened with incarceration on at least one occasion

if he did not bring the payments current.

6

About this time, Debtor engaged an accountant, Richard Greenwald, to prepare his delinquent tax returns.  Mr. Greenwald suggested Debtor contact an attorney because tax delinquencies often raise legal issues.  It is unclear whether Debtor hired the accountant directly in response to Melanie's motion for contempt.  Debtor testified he hired the accountant because he wanted closure on his tax problems and wanted to try to work out something with the IRS. Based on testimony of Mr. Greenwald, Debtor paid him by a check dated July 16, 2002.  There is no evidence for when Melanie filed her motion for contempt, although a hearing on the motion was held in September 2002.

At the September 2002 hearing, Debtor produced complete copies of his 1999, 2000, and 2001 tax returns, but he did not file them with the IRS at that time.[1]  Instead, he filed returns for all the years at issue in this case in June 2003.  Based on his tax returns, Debtor's gross income (after business expenses but before alimony and child support) for the relevant years was as follows:

    1998 - $177,750
    1999 - $135,085
    2000 - $130,813
    2001 - $176,128
    2002 - $176,307

Debtor testified he did not file returns or otherwise contact the IRS during those years because he did not have the money to pay the full amount of his past due taxes, which he estimated at approximately $300,000 plus interest and penalties.  Debtor further testified he was afraid any contact with the IRS would result in the agency attempting to collect the full amount

---

[1] Debtor's 2002 tax returns, which also are at issue in this case, were not yet due when he provided tax returns to Melanie pursuant to her contempt motion.

7

owed at once.

Debtor testified that once his business began improving to the extent he believed he had

the resources to deal with his tax debt, on his own initiative, he took steps to approach the IRS.

### 2003 to 2007: Efforts to resolve the delinquency

In 2003, Debtor contacted attorney Bradley Coppedge to assist him with efforts to

compromise his tax delinquency.  Debtor testified he understood once he submitted an offer in

compromise, the IRS was required by its internal rules to halt collection efforts.  However,

Debtor also testified he did not begin the offer in compromise process with the intent to delay

paying the past due taxes until they became eligible for discharge in bankruptcy.  Instead, Debtor

and Kathleen both testified he contacted the attorney because they wanted to resolve the tax

problems so they could move forward with their lives.

Debtor filed the delinquent tax returns for 1998 to 2002 in June 2003.  At that time, the

2002 returns were two months late.  In September 2003, Debtor submitted an offer in

compromise for $25,000 to the IRS.  Debtor relied on the advice of Mr. Coppedge in selecting an

amount to offer.  The offer was returned in October 2003 due to certain deficiencies in

employment tax returns.  The IRS subsequently filed two notices of federal tax liens in January

2004.

Debtor resolved the problems related to his first offer in compromise and submitted a

second offer in January 2004 for $25,000.  Initially, after receiving the offer, the IRS did not

consider it because the agency erroneously determined Debtor was subject to an ongoing audit.

After discovering its mistake, the IRS returned the offer without considering it because Debtor

8

had made no estimated tax payments for 2003.

In April 2004, after being threatened with a levy by the IRS, Debtor submitted a third offer in compromise for $35,000.[2] Also, about this time, Debtor hired a new accountant, Richard Malott. In June 2005–more than a year after receiving the third offer–the IRS returned it because Debtor had fallen behind in his 2004 estimated tax payments. The delay in returning the offer was caused by mistakes made by the IRS regarding Debtor's tax compliance. At the time the IRS returned the third offer, it informed Debtor it had determined–based on internal standards for calculating his income and allowable expenses–he could pay his past due taxes in full. The IRS also told Debtor he could not submit another offer in compromise for six months.

In early to mid 2005, while the third offer was still pending, Debtor and Kathleen decided to build a new, larger house on Leafbrook Drive and agreed to pay $465,000 for its construction. Debtor and Kathleen testified they had several reasons for building the house. At that time, Debtor's younger daughter had come to live with them, and they believed they needed more room. In addition, based on advice from their attorney and accountant, they thought their tax issues would soon be resolved through an offer in compromise. The housing market was booming, and they expected the house to serve as an investment that would appreciate in value, which was of particular concern to Debtor because he had no retirement savings.

---

[2] Defendant has contended Debtor's tax attorney sent the IRS a letter in November 2004 in which he threatened bankruptcy if the IRS did not accept the third offer in compromise. The Court has been unable to locate such a letter anywhere in the three volumes of documents submitted by Defendant as evidence, nor did it find a reference to the letter in the transcript of trial testimony. The only November 2004 letter from Debtor's attorney to the IRS the Court found in evidence is one requesting reconsideration of the third offer in compromise, providing detailed rebuttals of income and expense figures used by the IRS in considering the offer, slightly increasing the amount offered to $38,000, and reserving the right to appeal any negative result. It does not mention bankruptcy as a possibility. (Def. ex. 21, doc. no. LMUSA 0415.)

On June 20, 2005, the IRS issued a notice of levy against all Debtor's assets and income. About this time, Mr. Malott advised Debtor he needed to remain current on his estimated withholding tax payments. He suggested Debtor form a corporation and work as an employee of the business. The business would receive his commissions, pay him a salary, and withhold payroll taxes, which would keep Debtor current with the IRS going forward. For those reasons, Debtor formed MI Real Estate Network, Inc. in August 2005. It did not begin operations at that time. Mr. Malott testified Kathleen was made the sole officer, director, and shareholder of the company because they did not think it would be a good idea to have someone with Debtor's tax problems heading it.

In December 2005, Debtor and Kathleen sold the Pintail house, realizing a profit of approximately $56,000. Kathleen deposited the proceeds into a bank account she had opened when she had started working as a Mary Kay beauty consultant in 2004. Kathleen used $46,000 of the proceeds as a down payment on the new Leafbrook house. Kathleen obtained a stated income loan for the Leafbrook house and titled the house solely in her name. She testified she obtained the loan because, unlike Debtor, she still had good credit, which was necessary even for a "no doc" loan.

The Leafbrook house was subject to two mortgages, initially requiring monthly payments of $2,762 and $546. After Kathleen refinanced several times, the total mortgage payment was approximately $3,500 per month. As with the prior house, Debtor made all the mortgage payments, insurance payments, and utility payments.

In February 2006, the IRS issued a levy on Debtor's income from Kennon Parker and a levy on Debtor's personal bank account. After consulting with legal counsel, Kennon Parker

10

determined the levy was a one-time levy, rather than a continuing levy, and made one payment to the IRS on February 8, 2006.  About this time, Debtor closed his personal bank account and began depositing his commission checks in the MI Real Estate account and Kathleen's Mary Kay account.

On February 16, 2006, Debtor proposed an installment agreement to pay his past due taxes.  A pending installment agreement stops any other collection activity by the IRS.  Unlike an offer in compromise, an installment agreement requires full repayment of the taxes.  Debtor proposed to timely make his estimated tax payments and to pay nine percent–eventually increasing to twelve percent–of his gross revenues to the IRS.

MI Real Estate began operations in April 2006.  There was a delay between formation of the corporation and beginning operations because Debtor had to take steps to comply with certain state laws to allow his real estate commissions to be paid to a corporation.[3]  Debtor's commissions from Kennon Parker were paid to MI Real Estate, which in turn paid Debtor as a salaried employee.  The corporation withheld Debtor's employment taxes, which ended his need to make estimated tax payments.  Kathleen also is paid a salary by MI Real Estate.  Their salaries were determined, in consultation with Mr. Malott, based on the amount of money they needed to pay their expenses.

According to tax records, in 2006 MI Real Estate's gross receipts totaled $251,000, which came solely from Debtor's commissions.  That year the company paid Debtor $78,625 and paid

---

[3] Although Debtor was in compliance with the law when MI Real Estate began operating, the law changed a few months later in July 2006 so that any real estate agent whose commissions are paid to a corporation must be at least a 20% shareholder in the corporation.  Debtor apparently made no effort to comply with the new law although he represented to Kennon Parker that he was in compliance.

Kathleen $26,000.  The corporation also paid all the expenses of the Larry Mitchell Team, which previously had been paid by Debtor.

In June 2006, the IRS accepted Debtor's proposed installment agreement.  In July and August 2006, Debtor made payments under the installment agreement.  On August 29, 2006, Debtor filed his bankruptcy petition.  He testified he did so because he had fully exhausted his options with the IRS and was unable to pay his expenses after the IRS took nine percent of his income.


### Late 2006 to present: Post-petition activity

In 2007, Kathleen purchased an investment property with the intent of renovating it and selling it for a profit.  Dan Parker, a part owner of Kennon Parker, loaned her money at Debtor's request for the purchase price and repairs.  She did not have to make monthly payments, but was required to repay the loan with interest at maturity.  When she sold the house, Kathleen repaid the loan in full, but made little or no profit.

In May 2007, Kathleen received her real estate license and began having her commission checks paid to MI Real Estate.

In December 2007, Debtor and Kathleen put the Leafbrook house on the market.  As of the time of trial, it remained unsold, although they recently had reduced the asking price from $499,000 to $479,000.


### Discretionary expenditures

**Divorce-related expenses:**  In late 1998 and 1999, during his separation from his first

12

wife Melanie, Debtor had been unable to maintain payments on Melanie's house, as required by

court order.  Jack Rogers, a co-signer on the mortgage, made the payments.  After the divorce,

Debtor sold the house at a loss and repaid Mr. Rogers with 10 percent of his commissions over

two years for a total of approximately $30,000.

**Investments:**  In 1999, Debtor purchased stock in Compaq and Intel.  He testified he did

so because he had no assets left after the divorce and was trying to rebuild.  Tech stocks were

doing well at the time, and he believed it was a good investment.  In addition, from January 2002

to August 2006, Debtor contributed $100 per month to an investment account.  He testified he

intended to use the money for his retirement.  There is no evidence Debtor attempted to conceal

his ownership of these accounts or otherwise make them unreachable by the IRS.

**Vacations:**  From 2002 to 2005, Debtor and Kathleen financed the purchase of three

vacation timeshares.  A timeshare in Destin, Florida, that had cost approximately $1,500 down

and $250 per month has been foreclosed upon in the bankruptcy.  They also purchased a

timeshare in Orlando, Florida, for $1,754 down and $200 per month and a timeshare with various

destinations that cost $650 down and $100 per month. Debtor testified the timeshares were the

most affordable way he knew how to provide a vacation for his family.

**Vehicles:**  In 2003, Kathleen purchased a used Jaguar sedan for approximately $19,000.

Debtor supplied a down payment of $2,000, which covered the taxes and other fees.  Kathleen

financed the purchase price, and the car was titled in her name.  However, Debtor made the

monthly payments of $407.  The car was purchased to replace an old minivan to enable Kathleen

to take the children to and from school.[4]  Also in March 2003, Kathleen purchased a Mitsubishi Lancer for her daughter, Brittany.  The loan and title were in Kathleen's name, but Debtor made the monthly payments of $347 and paid for insurance.  In 2005, Debtor purchased a 2000 Pontiac Grand Am for $5,000 for his younger daughter Lindsay.  In 2008, Debtor purchased a Nissan Pathfinder with cash after his existing car, a Ford Expedition, was repossessed.  He testified he paid cash because he was unable to obtain financing.  Debtor also leased a GMC Trailblazer that he surrendered in the bankruptcy case.

**Utilities:**  Debtor paid $126 per month for cable from 1999 to 2005.  From 2003 to the present Debtor has paid for three cell phones–one for himself, one for Kathleen, and one for Brittany.

**Educational expenses:**  From 1999 to 2006, Debtor made monthly payments of approximately $211 on a student loan incurred by Kathleen prior to their marriage.  The loan currently is in deferment.  Debtor paid college tuition and book costs of approximately $15,000 for Brittany at Columbus State University from 2005 to 2008.  During that time, Brittany lived at home and worked part time to pay for her own clothes, meals away from home, and other incidental expenses.

**Charitable contributions:**  Debtor donated a portion of his income to his church, in the following amounts: $351 in 1998, $0 in 1999, $6,310 in 2000, $10,860 in 2001, $13,453 in 2002, $15,700 in 2003, $14,167 in 2004, $11,068 in 2005, and $9,088 in 2006, for a total of about

---

[4] At that time, Debtor had a spare vehicle–a GMC Trailblazer.  However, it was not available for Kathleen to use because Debtor had loaned it to his older daughter, Holly, who was recently divorced and had no other means of transportation.  She was not a minor, and Debtor had no legal support obligations to her.

14

$81,000.  Neither party provided evidence about Debtor's contribution history prior to 1998.

**Child care:** Beginning in 2002 until late 2003 or early 2004, Debtor paid $500 per month

for daycare for his youngest child.  During that time, Kathleen was unable to watch the child

because she was working at Debtor's office without pay, doing various administrative tasks, such

as coordinating advertising and team-building projects.

## Conclusions of Law

### Overview

Pursuant to 11 U.S.C. § 727(b) a Chapter 7 debtor is entitled to a discharge of all debts

except those listed in § 523(a).  Section 523(a)(1)(C) provides the discharge does not apply to tax

debt "with respect to which the debtor made a fraudulent return or willfully attempted in any

manner to evade or defeat such tax[.]"  11 U.S.C. § 523(a)(1)(C).  The burden rests with the

government to prove nondischargeability of a tax debt by a preponderance of the evidence.

Griffith v. U.S. (In re Griffith), 206 F.3d 1389, 1396 (11th Cir. 2000).

The Eleventh Circuit Court of Appeals has set forth a two-prong test for determining

whether a debtor has willfully evaded his taxes that requires a showing of (1) evasive conduct

and (2) a mental state consistent with willfulness.  U.S. v. Jacobs (In re Jacobs), 490 F.3d 913,

921 (11th Cir. 2007).  The conduct requirement may consist of affirmative acts or omissions "'to

avoid payment or collection of taxes.'"  Id. (quoting In re Gardner, 360 F.3d 551, 558 (6th Cir.

2004)).  Mere nonpayment of taxes is not sufficient by itself to satisfy the conduct requirement.

Griffith, 206 F.3d at 1395.  However, nonpayment in conjunction with failure to file returns can

constitute evasive conduct.  See U.S. v. Fretz (In re Fretz), 244 F.3d 1323, 1329-30 (11th Cir.

2001).  To satisfy the mental state, or willfulness, element the government must show the debtor

acted "voluntarily, consciously or knowingly, and intentionally."  Id. at 1330.  The government

can prove willfulness by showing the debtor had a duty to pay taxes, knew of the duty, and

voluntarily and intentionally violated the duty.  Id.

### Conduct

In this case, Debtor's failure to timely file tax returns for years 1998 to 2002 coupled with

his failure to pay income taxes for those years constitutes acts sufficient to satisfy the conduct

requirement.  Fretz, 244 F.3d at 1329-30.  Nothing in the evidence mitigates this conduct.  Thus,

the Court finds Defendant has proved the conduct prong of willful tax evasion.

### Mental State

The mental state requirement does not lend itself to such easy resolution.  Debtor in this

case admitted in his testimony he had a duty to pay income taxes and he knew of the duty.

Therefore, the only question is whether he voluntarily and intentionally violated the duty.  The

court in Peterson v. U.S (In re Peterson), 317 B.R. 556 (Bankr. N.D. Ga. 2004), described the

difficulty in analyzing this element of the mental state requirement and set forth a framework for

doing so:

> In cases of this nature, direct evidence is rarely available to prove
> the intent of a debtor.  Therefore, courts rely on certain types of
> conduct sometimes called "badges of fraud" that provide an indicia
> of a "willful" evasion by the debtor to defeat or evade his or her tax
> liability.  This conduct may include (I) the understatement of
> income for more than one tax year; (ii) implausible or inconsistent
> behavior; (iii) the debtor's failure to cooperate with the IRS; (iv)
> inadequate record keeping; (v) transfers of assets for inadequate
> consideration; (vi) transfers that greatly reduce assets subject to
> IRS execution and (vii) any other conduct that is likely to mislead
> or conceal.  Not one of these factors is determinative since the

16

court considers the totality of the circumstances in each individual
case.  However, the presence of multiple factors gives rise to a
<u>rebuttable presumption</u> of willful evasion.

<u>Id.</u> at 563-64 (citations omitted) (emphasis added).

The badges of fraud cited by <u>Peterson</u> are only tangentially implicated in this case.  There

is no evidence or any allegations of wrongdoing with respect to the first and fifth badges on the

<u>Peterson</u> list.  Debtor has neither misstated his income nor made any transfers for inadequate

consideration.  In fact, his lack of assets following the divorce from Melanie made such transfers

impossible.

As to the second badge, implausible or inconsistent behavior, Defendant has shown that

Debtor–through his wife–purchased a house for $465,000 at the same time he was trying to

compromise his tax debt for a mere $30,000, and Defendant characterized this behavior as bad

faith.  The Court characterizes it as ill-advised, foolish, and demonstrative of extremely poor

judgment.  However, based on Kathleen's testimony, their reasons for buying the house are

entirely unconnected to bad faith or evasion but were instead rooted in unfounded optimism and

the need for more space for their growing household.  Debtor and Kathleen were optimistic their

tax problems would soon be behind them.  Thus, the house was not purchased to thwart the IRS

in any way but rather on the premature assumption that the tax problems would no longer be an

issue.  In addition, they were optimistic that real estate prices would continue to rise, which

would provide the Mitchells with some assets on which they could rely for retirement.  Planning

for retirement, especially after having most of his assets depleted by divorce, is not evidence of

inconsistent or implausible behavior or otherwise indicative of evasive intent.

With respect to the third badge, failure to cooperate with the IRS, Defendant has argued

Debtor used the offer in compromise process for the purpose of stalling IRS collection efforts until such time as the taxes would be eligible for discharge in bankruptcy. However, the IRS was primarily responsible for drawing out the offer in compromise process by repeated errors on its part and its refusal to actually consider the offers made by Debtor. Instead of either accepting or rejecting the offers, the IRS simply returned them due to technical defects. The third offer sat in limbo for 14 months–during which time the IRS, pursuant to its own rules, could take no collection action–because of IRS mistakes, not due to any actions by Debtor. Debtor could not possibly have anticipated and relied upon such a delay caused by the IRS as part of a scheme to discharge his taxes. Furthermore, Defendant offered no evidence that Debtor withheld information from the IRS or in any other way impeded its ability to consider the offers in compromise.

Defendant also made vague allegations relating to the fourth badge of fraud–inadequate record keeping. Although Defendant claimed records were missing, it was never able to specify what records were missing that should have been available, nor was it able to show that it requested certain records that were not turned over. Thus, the Court has no evidence of inadequate record keeping.

As to the sixth badge of fraud, Debtor arguably made transfers that greatly reduced assets subject to IRS execution when he began depositing his commission checks into Kathleen's Mary Kay account and the MI Real Estate account. However, income is not the sort of asset targeted by this badge of fraud. Debtor's income is simply the cash flow he uses to pay his ordinary living and business expenses, and by doing so he is not diminishing his net worth in any way. The Court cannot conclude that paying necessary expenses to support a family and business

18

somehow suggests evasion. In <u>Roper v. Barclay</u> (<u>In re Roper</u>), 294 B.R. 301 (B.A.P. 8th Cir. 2003), a dischargeability case based on willful tax evasion, the debtor began depositing his paycheck in his wife's bank account, and she used the money to pay household bills and expenses, including the mortgage and car payments. <u>Id.</u> at 304-05. The court said, "These payments were not made with an intent to evade payment of the [debtor's] tax liability; rather they were made with the intent of keeping the house and vehicles so the Debtor and his family would have a place to live and would have a means of transportation." <u>Id.</u> at 305.

Turning to the final badge of fraud, there is little evidence of conduct likely to mislead or conceal. The only behavior that might be relevant is putting the Pintail and Leafbrook houses in Kathleen's name even though Debtor was paying all the bills. Debtor freely admitted it was done in part to protect the family home from the IRS. However, that was not the only consideration. As Kathleen testified, Debtor's history of financial problems raised some question about his ability to obtain a mortgage. Although Kathleen did not have the means to pay a loan, she did have a clean credit history, which was necessary to obtain the loan. Even with respect to the Pintail house, where the prior owner financed the sale and understood Debtor would be the person repaying the loan, Kathleen testified the prior owner still wanted to actually make the loan to someone who presented a better credit risk.

Defendant also has argued Debtor formed MI Real Estate to prevent the IRS from reaching Debtor's commissions. The Court finds no evidence to support that contention. On the contrary, the evidence indicates Debtor formed MI Real Estate to ensure the payment of his income taxes going forward. The IRS actually benefitted from the creation of the corporation with respect to Debtor's ongoing tax liabilities.

19

As this discussion shows, there is some evidence as to various badges of fraud. However, none of the evidence is conclusive. To the extent the evidence is sufficient to raise a presumption of fraudulent intent, the Court finds the testimonial explanations provided by Debtor and Kathleen, as described in the above discussion, sufficient to rebut the presumption. Both were credible witnesses. Kathleen presented a particularly sincere demeanor. While Debtor was somewhat pugnacious on cross examination, his testimony was consistent with other witnesses and the documentary evidence. Therefore, the Court cannot conclude Defendant has proved the mental state requirement based on badges of fraud.

Defendant does not rely solely on badges of fraud. It also relies on two Eleventh Circuit Court of Appeals cases in which the debtors' tax debts were determined to be nondischargeable due to willful tax evasion. Defendant argues, pursuant to these cases, that Debtor's taxes are nondischargeable because he had the ability to pay his taxes, but "elected" to divert his money toward other expenses. Those discretionary expenses include:

- maintenance of rental properties
- purchase of stock
- purchase of various vehicles for family members
- tithes to his church
- attorney fees from his divorce proceedings
- accountant fees related to his tax problems
- student loans for Kathleen
- college tuition for Brittany
- vacation timeshares
- debt to Jack Rogers for his ex-wife's house payment
- daycare expenses for his youngest child

Defendant argues that the discretionary expenditures represent the sort of lifestyle choices that justified a finding of nondischargeability in Jacobs. The debtor in Jacobs was a lawyer who lived in a golf resort community on Amelia Island. The debtor was the sole shareholder and

20

officer of his law firm, which characterized his earnings in such a way that the firm was not

required to withhold tax payments.  The debtor failed to pay taxes for seven years beginning in

1990, although he did file returns for those years.  During the relevant years, the debtor's wife

operated an unprofitable jewelry store.  The debtor and his law firm paid the store more than

$160,000 over several years, which the debtor described as loans, even though the loans were

never documented or repaid.  When the debtor purchased his house in 1995, the mortgage

company refused to loan him the money due to his bad credit, but agreed to loan the money to his

wife.  In addition, the lender did not want the debtor's name on the title because of tax liens.

While both the debtor and his wife were on the note, the house was titled solely in the wife.  The

debtor made all the payments on the house.  Other expenses included monthly country club dues

of $1,600 and monthly golf fees of $250, cosmetic surgery for the wife costing $20,000, and a

leased Mercedes Benz for the wife costing $600 per month.  The debtor went through numerous

vehicles, including a minivan, a Jeep, and three SUVs, that were used for business and personal

purposes.  The debtor also made contributions of $12,000 each to two charities and a

contribution of approximately $2,000 to a third charity.  He also gave cash gifts to his adult

children totaling more than $25,000 to assist them with education, housing, and transportation.

490 F.3d at 916-19.

The bankruptcy court found the debtor's tax debt to be dischargeable and the district

court reversed.  Id. at 920.  The circuit court affirmed the district court, finding that the

bankruptcy court "failed to address the evidence supporting a finding of willfulness."  Id. at 927.

The circuit court had little to say with respect to the mental state requirement.  It specifically

pointed to the characterization of the debtor's income in a manner to prevent withholding, his

failure to pay estimated taxes, and the undocumented loans to his wife's business.  Id.  "At the very least, the evidence shows that Mr. Jacobs's failure to fully pay his taxes, while making such large loans and expenditures, was done 'voluntarily, consciously or knowingly, and intentionally.'"  Id.  "The Bankruptcy Court's finding that Mr. Jacobs regretted not paying his taxes does not suffice to defeat a finding of willfulness."  Id.

While Debtor's case bears some similarities to Jacobs–most notably titling an expensive house in the wife's name while the debtor pays all the bills–the differences are more significant. The debtor in Jacobs mischaracterized his income to avoid taxes, made large payments to his wife's failing business, and made large expenditures on luxury items.  None of those facts are present in this case.  Jacobs is more akin to the facts in Peterson, in which the debtor charged thousands of dollars a week to maintain "a lifestyle that consisted of perpetual shopping sprees, fine dining, expensive entertainment and extensive travel."  317 B.R. at 561.  The purchases included such luxury items as clothing, perfume, and fine jewelry for the debtor's girlfriend. While the debtor failed to pay his taxes, he often paid in excess of $5,000 per month toward his credit card debt.  Id. at 561, 564.  The court found the "lavish and extravagant" lifestyle to be evidence of willful tax evasion.  Id. at 575.

Defendant in this case can recite numerous discretionary expenses paid by Debtor, but they are simply not in the same category of unrestrained consumption as the Jacobs and Peterson expenses.  Instead of monthly country club dues, plastic surgery, and expensive jewelry, Debtor had day care payments, divorce debt, and school loans.

Specifically, several of the expenses cited by Defendant–maintenance of rental properties, payment of attorney fees from his divorce proceeding, and the debt to Jack Rogers–are directly

22

related to his divorce.[5]  The divorce court barred him from selling the rental properties.  When he

was able to sell them, he received no financial benefit from the sales.  Court ordered payment of

attorney fees is not discretionary, especially when failure to pay them may result in incarceration.

As to Jack Rogers, the fact that he had to assist Debtor in satisfying his obligation to pay the

mortgage on Melanie's residence supports Debtor's contention that he could not afford to pay all

his expenses.  By repaying Mr. Rogers at a later date, Debtor effectively deferred his divorce

obligations; it was not an effort to defraud the IRS.

 With respect to Debtor's stock purchases, he did not try to hide his ownership of those

assets.  He held them openly and did so for the purpose of providing for his retirement, not to

hinder the IRS in any way or fund a lavish lifestyle.

 The educational expenses–payment of Kathleen's student loans and Brittany's college

tuition–as well as the various family vehicles paid for by Debtor were not extravagant.

Educational and transportation expenses, while not strictly necessary, are common financial

burdens incurred by many families and are not unusual or excessive.  See Roper, 294 B.R. at 305.

In fact, the vehicle purchases show a measure of restraint in that they were bought used and none

were unusually expensive.  Even Kathleen's Jaguar cost no more than a very modest new car.

 Debtor's accountant fees and daycare expenses can only be described as discretionary by

the broadest definition.  The accountant was hired to help Debtor resolve his tax problems, a task

Debtor was ill-equipped to pursue without professional advice.  "Relying on the expertise of

---

[5] Defendant also argued that Debtor's failure to seek a reduction in support payments was somehow indicative of an intent to evade taxes.  However, Defendant abandoned that argument after conceding that such a reduction was likely impossible to achieve under Georgia domestic relations law.

23

professionals to deal with difficult financial issues is not evidence of an intent to evade taxes[.]
Roper, 294 B.R. at 305.  Similarly, the daycare payments were a necessary expense because they
freed Kathleen to work, uncompensated, for Debtor's business, which saved him the cost of
hiring an administrative assistant.

As for Debtor's donations to his church, Defendant cites Lynch v. U.S. (In re Lynch), 299
B.R. 62 (Bankr. S.D.N.Y. 2003), in which the court said it could not "endorse the view that one
can evade payment of tax obligations by making gratuitous transfers out of religious motivation,
even if sincere," noting that tithing is optional.  Id. at 85.  Congress has provided special
treatment for the charitable contributions of bankruptcy debtors in certain situations,[6] but
determination of dischargeability of tax debt is not among them.  Nevertheless, charitable
contributions do not carry the same weight in a tax evasion analysis as does, for example, hiding
assets because the debtor neither gains nor retains a material benefit at the expense of the IRS.
Therefore, the Court does not find Debtor's donations to be evidence of willfulness.

Perhaps the most serious of Debtor's discretionary expenses are the purchase of three
vacation timeshares.  Debtor testified he bought them because it was the most affordable way he
knew to provide a vacation for his family.  The fact that he resorted to timeshares suggests he
was incapable of independently saving for a vacation.  Both individually and collectively
represented a reasonable cost for a vacation for a family of five or six.  Moreover, it appears
Debtor was financially unable to afford ownership of all these properties, as he lost the Destin
timeshare to foreclosure.

In addition to Jacobs, Defendant relies heavily on the circuit court's decision in Fretz, in

---

[6]  See 11 U.S.C. §§ 544(b)(2), 548(a)(2), 1325(b)(2)(A)(ii), 1325(b)(3).

which the court found the tax debt to be excepted from discharge.  Defendant argues the case is

analogous because the debtor in <u>Fretz</u>, who failed to file returns or pay taxes for a 10-year period

never attempted to hide or conceal assets.  However, once again, the differences in that case far

outweigh any similarities.

In <u>Fretz</u>, the debtor was an emergency room physician.  During the relevant time period,

from 1982 to 1992, he worked as an independent contractor, so the hospital did not withhold

taxes from his pay.  Also during that time, the debtor failed to make estimated tax payments, to

file returns, or to pay income taxes.  The debtor was also an alcoholic throughout the period; he

stopped drinking in 1993.  The court specifically noted he had made no efforts to conceal any

assets.  In 1994, the debtor pleaded guilty to a criminal charge related to his failure to file tax

returns.  In November 1994, he signed returns prepared for him by the IRS.  He filed a

bankruptcy petition in June 1997 and sought to discharge his income taxes.  244 F.3d. at 1325-

26.  The bankruptcy court found the taxes to be dischargeable, the district court affirmed, and the

circuit court reversed.  <u>Id.</u> at 1326, 1331.

After determining that the debtor in <u>Fretz</u> satisfied the conduct requirement by both

failing to file returns and failing to pay taxes, the court considered the mental state requirement,

focusing on whether he had voluntarily and intentionally violated his duty to pay taxes.  <u>Id.</u> at

1330.  The court found no basis for concluding the debtor's failure to file returns and pay taxes

"was due to inadvertence or mistake[.]"  <u>Id.</u> at 1331.  Instead, the court found that the debtor had

the financial means to pay his taxes.  <u>Id.</u>  And, it rejected any argument that his alcoholism

interfered with his ability to file returns and pay taxes.  <u>Id.</u>  "Put bluntly, someone who can

control his drinking enough to perform medical procedures during twelve- to twenty-four hour

shifts in an emergency room over a period of years can control his drinking enough to file tax

returns and pay taxes during that same period." Id.  Because the debtor could carry out his

professional responsibilities, the court concluded he "chose to ignore" his tax responsibilities.  Id.

Therefore, the court found the mental state requirement was satisfied and the taxes were

nondischargeable.  Id.

Fretz does not, as Defendant suggests, stand for the proposition that merely failing to file

returns or pay taxes is sufficient to satisfy the conduct prong of the willful evasion analysis.  The

debtor in Fretz made no effort to resolve his tax problems until he faced criminal charges.  Even

then he did not prepare his own returns, but merely signed returns prepared by the IRS.

Furthermore, the debtor could afford to pay his taxes, and the alleged cause of his tax failures–his

alcoholism–only affected a narrow slice of his financial life: it apparently affected his ability to

pay taxes, but not his ability to earn money.  That discrepancy was of particular significance to

the circuit court's reasoning.  Id.

Again, Debtor in this case bears little resemblance to the debtor in Fretz.  Debtor

voluntarily approached the IRS to resolve his tax problems and prepared his own returns.  In

addition, the cause of his tax problems–the fallout from his divorce–also affected other key areas

of his life, including his health and his ability to work.  Debtor's financial problems were largely

caused by his divorce and various medical problems that had a direct effect on his employment.

By Defendant's own evidence, Debtor's adjusted gross income dropped by approximately

$40,000 to $45,000 in 1999 and 2000, which coincides with the timing of the divorce.  Debtor

has also repeatedly asserted he could not afford to pay the taxes–a significant distinction from

Fretz.  This assertion leads back to Defendant's argument that Debtor opted to pay discretionary

expenses ahead of the IRS.  As set forth above, the Court finds that argument unpersuasive because the expenses are reasonable costs of living, appropriate to Debtor's income and employment circumstances.  Debtor is not "enjoy[ing] an opulent lifestyle at the expense of the IRS." <u>Pisko v. U.S.</u> (<u>In re Pisko</u>), 364 B.R. 107, 114 (Bankr. M.D. Fla. 2007).

As explained in <u>Peterson</u>, an analysis of Debtor's mental state requires the Court to consider the totality of the circumstances.  Having considered the badges of fraud, Debtor's discretionary expenses, and the various forces impacting Debtor's financial situation, the Court finds insufficient evidence to support a conclusion of willfulness.

<u>Conclusion</u>

The government has failed to establish that Debtor willfully evaded his income taxes. Although, Debtor's failure to file tax returns or pay his taxes satisfies the conduct requirement, the case lacks the type of fraudulent behaviors–such as hidden assets or extravagant spending–that would support a finding of willfulness.  Therefore, the Court concludes the tax debt at issue in this case may be discharged, and judgment will be entered for Debtor.

END OF DOCUMENT